**UNITED STATES of America, Plaintiff,**

v.

**Joel JENISON, Defendant.**

**No. 78–296–Cr–JWH.**

United States District Court,
S. D. Florida.

Dec. 18, 1979.

Michael P. Sullivan, Asst. U. S. Atty., Miami, Fla., for plaintiff.

L. Van Stillman, Ft. Lauderdale, Fla., William M. Moran, James J. Hogan, Miami, Fla., Bruce M. Lyons, Ft. Lauderdale, Fla., Joseph Beeler, Miami, Fla., for defendants.

## MEMORANDUM OPINION

HATCHETT, Circuit Judge, Sitting by Designation.

### INTRODUCTION

In a four count indictment filed on August 31, 1978, defendants were charged with importation and possession with intent to distribute, and conspiracy to import and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 952(a), 841(a)(1), 846, and 18 U.S.C. § 2. By cumulative motions to dismiss the indictment pursuant to 28 U.S.C. § 1867(d), defendants allege that grand jury selection procedures of the Southern District of Florida are unconstitutional and in violation of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1875. Evidence was received and affidavits and memoranda were submitted by the parties. Finding neither constitutional infirmity nor substantial non-compliance with the Act, I deny the motion to dismiss.

### STANDING

The claims presented here arise from provisions of the United States Constitution and the Jury Selection and Service Act. Standing to assert these claims lies regardless of the race or class of the defendants. *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Furthermore, the challenges may be made even though the particular jury drawn from the questioned pool is unobjectionable. *Thiel v. Southern Pacific Company*, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); *Rabinowitz v. United States*, 366 F.2d 34 (5th Cir. 1966). Finally, the movants need not demonstrate that they have been prejudiced by the objectionable action in order to secure a decision in their favor. *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); *Reece v. Georgia*, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955).

### ISSUES

In the twelve months since the original motion to dismiss, the defendants have expanded their claims through amended and supplemental motions to include numerous challenges to the selection procedures of this district. These claims may be summarized as follows:

I. Underrepresentation of and discrimination against cognizable classes in the composition of the grand juries for the Southern District.

 A. Systematic exclusion of women, blacks, and Latins from selection as grand jury forepersons. Fifth amendment and sixth amendment, U.S.Constitution; 28 U.S.C. §§ 1861, 1862.

 B. Improper use of voter registration lists as the sole source from which the names of prospective jurors are selected. 28 U.S.C. § 1863(b)(2).

II. Impermissible interjection of deputy clerks and prosecutors into the selection process for grand jury forepersons. Rule 6(c), Fed.R.Cr.P.

III. Substantial deviation from the provisions of the Jury Selection and Service Act and the local plan resulting from the following activities and procedures employed by personnel in the jury section of the Clerk's Office for the Southern District of Florida.

 A. Usurpation of judicial functions in the determination of excuses, exemptions, deferrals, and disqualifications. 28 U.S.C. § 1865.

 B. Failure to require return of completed juror forms. 28 U.S.C. § 1864(a).

 C. Granting of preferential treatment to certain groups and individuals.

 D. The incident referred to as "palming" allegedly engaged in by jury section chief, William Ross Hornsby.

## DISCUSSION OF ISSUES

### I. Grand Jury Composition.

A. Systematic exclusion of identifiable groups from selection as grand jury forepersons.

#### 1. Sixth Amendment Protection.

Criminal defendants are afforded the protection of a "speedy and public trial, by an impartial jury" under the sixth amendment to the United States Constitution. The requirement of an impartial grand jury has been interpreted to mean a jury composed of members drawn from a fair cross-section of the community. *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). This "fair cross-section" requirement is codified in the policy declaration of the Jury Selection and Service Act, 28 U.S.C. § 1861.

 Because in sixth amendment challenges the "focus [is] on the issue of a fair cross section and not on the issue of discrimination," a defendant is not required to show bad faith and a prima facie showing of systematic exclusion may not be rebutted by proof of non-discriminatory intent. *United States v. Armsbury*, 408 F.Supp. 1130, 1140 (D.Or.1976); *Duren v. Missouri*; *Rabinowitz v. United States.* When jury selection procedures come under sixth amendment scrutiny, "systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section." *Duren v. Missouri*, 439 U.S. at 368 n.26, 99 S.Ct. at 670 n.26. It is irrelevant that the discrimination, if any, was unintentional. *United States v. McDaniels*, 370 F.Supp. 298 (E.D.La.1973). Once a prima facie case of systematic disproportion has been made under a fair cross-section challenge, it can only be rebutted by showing that a significant state interest is manifestly advanced by those aspects of the selection process that result in the exclusion. *Duren v. Missouri*, 439 U.S. at 368, 99 S.Ct. 664.

#### 2. Federal Equal-Protection.

 Federal law also proscribes the *discriminatory* exclusion of cognizable classes from jury service. 28 U.S.C. § 1862. While the constitutional right to equal protection in jury selection cases is often said to rest on the fourteenth amendment prohibition against *state* discrimination, the right also extends to federal defendants challenging the composition of their grand or petit juries. Fifth amendment, U.S. Constitution; *United States v. Gordon-Nikkar*, 518 F.2d 972 (5th Cir. 1975). As recognized by the Supreme Court, "although it contains no Equal Protection Clause as does the Fourteenth Amendment, the Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.'" *Schlesinger v. Ballard*, 419 U.S. 498, 500, n.3, 95 S.Ct. 572, 574 n.3, 42 L.Ed.2d 610 (1975); *Schneider v. Rusk*, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964). This means that, "[i]f a classification is invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also invalid under the Due Process Clause of the Fifth Amendment." *United States v. Gordon-Nikkar*, at 976. *See, Johnson v. Robinson*, 415 U.S. 361, 363, n.4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). The "federal action" right invokes the same judicial scrutiny and analysis as employed in the review of state action challenges under the fourteenth amendment. *Califano v. Goldfarb*, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *United States v. Gordon-Nikkar.* Because discriminatory purpose is an essential element of this constitutional violation, truth of non-discriminatory intent is sufficient to rebut a prima facie showing of systematic exclusion. *Duren v. Missouri*, *Castaneda v. Partida.*

#### 3. Constitutional Protections and the Grand Jury Foreperson.

The government contends that no constitutional rights are implicated by systematic discrimination in the appointment of feder-

al grand jury forepersons. *Hale v. Henderson*, 485 F.2d 266 (6th Cir. 1973). It is contended that where the grand jury venire was selected in a manner that did not systematically exclude any cognizable classes, disproportionate representation of identifiable groups in the office of federal grand jury foreperson is irrelevant. According to the government, the Supreme Court in *Rose v. Mitchell* did not hold otherwise. As the government emphasizes, the Supreme Court merely assumed, without deciding, that "discrimination with regard to the selection of only the foreman" would require the same result "as if the discrimination proved had tainted the selection of the entire grand jury venire." 443 U.S. at 551 n.4, at 2998 n.4. The *Rose* court, then, is said to have left undecided the question whether grand jury foreperson selection procedures are subject to constitutional scrutiny. Regardless of the Court's holding, the government argues that *Rose v. Mitchell* is distinguishable in any event because the state grand jury foreperson in question there held important statutory powers not possessed by federal grand jury forepersons. Both points are unpersuasive.

■ The Supreme Court in *Rose v. Mitchell* had no disagreement with the Sixth Circuit's conclusion that "proof of discrimination in the selection of a grand jury foreman mandates the same remedy as does proof of discrimination in the selection of the grand jury." *Mitchell v. Rose*, 570 F.2d 129, 135 (6th Cir. 1978); *rev'd.*, 443 U.S. 545, 99 S.Ct. 2993 (1979). This premise underlies the Supreme Court's lengthy analysis concerning discriminatory intent. The claim of the *Rose* defendants failed because "as a matter of law, respondents failed to make out a prima facie case of discrimination." *Rose v. Mitchell*, 443 U.S. at 574, 99 S.Ct. at 3009. Had discrimination been shown, the Sixth Circuit's order setting aside the indictment and conviction would have been sustained. There is therefore no merit to the government's assertion that no constitutional significance attaches to the office.

The government's alternative argument is also meritless. The federal grand jury foreperson, like his counterpart in Tennessee, "is a full member of the grand jury . . . and like every other chairperson is in a position to guide, whether properly or improperly, the decision-making process of the body." *Mitchell v. Rose*, at 136. Although the Tennessee foreperson has additional duties, the *significant* powers are the same and *Rose v. Mitchell* is not distinguishable in this respect.

It is the opinion of this court that the Supreme Court in *Rose v. Mitchell* did not intend to exclude from constitutional scrutiny the procedures employed in the selection of grand jury forepersons. The analysis in *Rose v. Mitchell*, however, must be put in its proper constitutional perspective. The respondents in that case were blacks alleging intentional discrimination under the equal protection clause of the fourteenth amendment. Although the Supreme Court indicated that "equal protection" would not permit *purposeful* discrimination in the selection of grand jury forepersons, it did not address the fair cross-section issue.

The purpose of the fair cross-section requirement is to assure both the "diffused impartiality" of a jury drawn from a broadly representative pool and "Community participation in the administration of the criminal law." *Taylor v. Louisiana*, 419 U.S. at 530–31, 95 S.Ct. at 698; quoting, *Thiel v. Southern Pacific Company*, 328 U.S. 217, 227, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting). Neither of these purposes is offended when disproportionate representation is shown in the office of foreman on grand juries whose members were drawn from panels reflecting a fair cross-section of the community from which they were drawn. The fair cross-section right extends to defendants the opportunity of a jury whose members reflect the several "qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *Peters v. Kiff*, 407 U.S. 493, 503–4, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972). Absent a showing that the impact of the grand jury foreperson is so substantial as to influence

or alter the unique qualities and characters of the jury's individual members, a defendant's right to a fair cross-section is not denied where identifiable groups are underrepresented in the position of grand jury foreperson. No such showing has been made. Accordingly, in order to prevail, the defendants must demonstrate purposeful exclusion of cognizable classes from the office of grand jury foreperson. Fifth amendment, United States Constitution; *United States v. Gordon-Nikkar, Schlesinger v. Ballard.* As noted, the Supreme Court has recently recognized the viability of the equal protection-discrimination challenge in the grand jury foreperson context. *See, Rose v. Mitchell.*

### 4. The Prima Facie Case.

▋ Because of the inherent difficulty in proving invidious discrimination on the part of state and federal officials, the courts have held that a prima facie case of discrimination may be proved by showing the systematic exclusion of identifiable groups. *Castaneda v. Partida* ; *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *United States v. Lopez,* 588 F.2d 450 (5th Cir. 1979). Perfect proportional representation or even some percentage approximating it is not required. *Swain v. Alabama.* But disparities can be so great and long existent as to shift the burden and require an explanation from the government. The prima facie concept stems from a recognition that "[i]f a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident . . . ." *Castaneda,* 430 U.S. at 494 n.13, 97 S.Ct. at 1280 n.13. To establish a prima facie case of discrimination, a defendant must show: (1) that the group allegedly discriminated against is a "recognizable, distinct class sin-

gled out for different treatment under the laws, as written or as applied;" (2) that the group has been substantially underrepresented on jury panels over a significant period of time; and (3) that the selection procedure is not racially neutral or is susceptible to being used as a tool of discrimination. *Lopez,* at 451. Once a prima facie case of discrimination has been shown, the burden shifts to the state to prove the absence of discriminatory intent. *Duren v. Missouri.* The prima facie case is not rebutted by the simple allegation that figures establishing population percentages do not make allowance for the excluded classes. *Castaneda v. Partida.* Nor is the state's burden met, as it would be in a sixth amendment fair cross-section case, by a government showing of "adequate justification" for the disproportionate representation of identifiable classes. *Duren v. Missouri,* 439 U.S. at 368 n.26, 99 S.Ct. 664.

Defendants claim that evidence adduced supports a prima facie case of discrimination in the appointment of blacks and women to the office of grand jury foreperson. This court agrees.[1]

### (a) Distinct and identifiable classes.

▋ Blacks are members of a group recognizable as a distinct class often singled out for separate treatment under the laws. *Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. 1272, *Hernandez v. Texas,* 347 U.S. 475, 478–79, 74 S.Ct. 667, 98 L.Ed. 866 (1954). Women are likewise "sufficiently numerous and distinct" as to warrant constitutional protection and satisfy the first prong of the prima facie test. *Duren v. Missouri,* 439 U.S. at 354, 99 S.Ct. 664; *Taylor v. Louisiana,* 419 U.S. at 531, 95 S.Ct. 692.

---

1. Defendants also attempted to show the requisite statistical disparity with regard to Latins in the office of foreperson. As the Fifth Circuit did in *United States v. Gordon-Nikkar,* this court "assume[s], without deciding, that resident aliens of Cuban descent in Miami constitute an 'identifiable segment' or a 'distinctive group' in that community." 518 F.2d at 975

n.3. The statistics presented as to Latins are deficient. The census data relied upon do not reflect the number of Latins residing in the district who were non-citizens. Without deciding whether Latins are underrepresented as forepersons in the Southern District, this court concludes that the data is simply insufficient to reliably calculate the requisite disparity.

(b) Susceptibility of procedure as tool of discrimination.

This court recognizes, as did the United States Magistrate in her report on the motion to dismiss, that "the selection of forepersons is susceptible of discrimination since the district judge can observe the race, ethnic background and sex of the grand jurors beforehand."

(c) Underrepresentation over a significant period of time.

The level of underrepresentation of qualified members of distinct classes is determined by comparing the proportion of the group in the total population to the proportion selected to serve as forepersons over a significant period of time. *Rose v. Mitchell*, 443 U.S. at 571, 99 S.Ct. at 3008; *Castaneda v. Partida*. This court must consider the "disparity between the ratio of [group members] chosen to be foreman to the total number of foremen, and the ratio of [group members] to the total popula-

tion." *Rose v. Mitchell*, 443 U.S. at 571, 99 S.Ct. at 3008.[2] Defendants presented evidence to show this disparity with regard to black and women forepersons in the Southern District of Florida.

### Blacks

The defense offered figures to show that of the fifty grand juries chosen in the Southern District of Florida during the period from 1974 to 1978,[3] one black was selected to serve as grand jury foreperson (see Chart 1). In other words, blacks comprised two percent (2%) of the total number of grand jury forepersons chosen over this period. Census figures utilized by the defense showed that blacks constituted sixteen and six-tenths percent (16.6%) of the voting age population.[4] The absolute disparity calculated from these figures is fourteen and six tenths (14.6) percentage points.[5] The resulting comparative disparity is eighty-eight percent (88%).[6] The

2. Other cases have suggested that to show underrepresentation, a disparity must be shown between the percentage of the group chosen and the percentage of those in the general population who are eligible to serve. *Newman v. Henderson*, 539 F.2d 502 (5th Cir. 1976); *Preston v. Mandeville*, 428 F.2d 1392 (5th Cir. 1970); *Labat v. Bennett*, 365 F.2d 698 (5th Cir. 1966). Although the preference in this circuit is for proof based on eligible population, the difficulty of obtaining full and accurate figures on eligibles has made proof of percentages in the total population acceptable. *Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975). Because, however, total population figures cannot account for disqualification factors which might decrease the comparative percentage of eligible group members, courts require evidence of a greater disparity when the defendant's case rests on total population figures. *Foster v. Sparks*, at 833; *United States v. Butera*, 420 F.2d 564 (1st Cir. 1970). The census figures relied upon by the defense are neither "total population" nor "eligible" statistics. Their reliability is heightened, however, by the fact that they reflect the voting age population.

3. This five year span is a "significant period" to support a showing of substantial underrepresentation and meet this prong of the prima facie case. See, *Castaneda v. Partida* ; *Swain v. Alabama* ; *Turner v. Fouche*.

4. The defendants have relied throughout on 1970 census data. The Supreme Court has on several occasions recognized the adequacy of census data from prior years. *Duren v. Missouri* (seven year old census data); *Alexander v. Louisiana* (six year old census data); *Castaneda v. Partida*, 430 U.S. at 511 n.15, 97 S.Ct. 1272 (court relied on assumption that 1960 census figures reflecting population percentages remained constant over a thirteen year period). The census data relied upon by defendants is not invalid as a reasonable indicator of present population factors. As in *Duren*, "there is no evidence whatsoever in the record to suggest that the 1970 census data significantly distorted the [applicable] percentage[s]." *Duren v. Missouri*, 439 U.S. at 365, 99 S.Ct. at 669.

5. The absolute disparity is calculated by subtracting the percentage of blacks who served as grand jury forepersons (2%) from the percentage of blacks in the general population (16.6%).

6. The comparative disparity is calculated by determining the percentage difference between the minority composition in the office in question and its proportion in the population. As explained in *Foster*, "[w]here, for example, negroes comprise twenty percent of the presumptively eligibles, their appearance on 10 percent

eighty-eight percent statistical disparity under the comparative measure is broad enough to establish the requisite underrepresentation of blacks in the office of grand jury foreperson in the Southern District of Florida. See, *Castaneda v. Partida; Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); *Swain v. Alabama; Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975).

CHART 1

### UNDERREPRESENTATION OF BLACKS AMONG FOREPERSONS IN THE SOUTHERN DISTRICT OF FLORIDA
#### (1974–1978)

A. Underrepresentation of blacks as forepersons (50 forepersons chosen: one black chosen)

1. Proportion black, aged 18–69, citizen population of district (1970 census) ........................ 16.6%

2. Percentage of black forepersons chosen (1/50) ... 2.0%

3. Absolute disparity .......................... 14.6 percentage points

4. Comparative disparity ...................... 88.0%

### Women

As in the case with blacks, the defendants have shown substantial underrepresentation of women among forepersons in the Southern District of Florida. The census figures indicate that women comprise fifty-three percent (53%) of the voting-age population of the Southern District. Women forepersons were selected in five of the fifty grand juries chosen during the period from 1974 to 1978. (See Chart 2.) Women therefore comprised ten percent (10%) of the total number of forepersons chosen during this period. The deviation is calculated as a forty-three percent (43%) absolute disparity and an eighty-one percent (81%) comparative disparity. Under either measure, the deviation is of sufficient magnitude to establish substantial underrepresentation of women in the office of grand jury foreperson. See, *Duren v. Missouri; Castaneda v. Partida*; *Turner v. Fouche*; *Whitus v. Georgia*; 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).

This court concludes that with regard to blacks and women, the defense has demonstrated a prima facie case of discrimination in the selection of grand jury forepersons in the Southern District of Florida.

of the venires can be viewed as a 10 percent deviation under the absolute view, or a 50 percent deviation under a comparative view." *Foster*, at 834. Although the preferable view is that an absolute measure should be employed, "an intractable use of the absolute measure may, in certain circumstances, also produce distorted results." Id. at 835. The *Foster* court continued:

> For example, if a district with 10% non-white population has .5% non-whites in the wheel, the 9.5% disparity may not evoke disapproval under an absolute measure but may require it under a comparative measure. Hence, flexible use of the two measures is

advisable, with the selection of either to be guided by both a desire to avoid distorted results and a need to adequately protect the interests of those challenging the selection system.
Id. at 835.
Clearly, the absolute measure should not be inflexibly applied to foreclose a prima facie case where its utilization may distort the significance of the figures shown. With the percentages shown in this case, the comparative measure is least likely to distort the significance of the deviation and most adequately protects the interests of the selection system and those who challenge it.

CHART 2 UNDERREPRESENTATION OF FEMALES AMONG
FOREPERSONS IN THE SOUTHERN
DISTRICT OF FLORIDA

A. Underrepresentation of females as forepersons (50 forepersons chosen: 5 female and 45 male)

1. Proportion female; aged 18–69; citizen population of district (1970 census) ...................... 53.0%

2. Percentage of female forepersons chosen ....... 10.0%

3. Absolute disparity .......................... 43 percentage points

4. Comparative disparity ...................... 81.0%

5. *Rebuttal of the Prima Facie Case.*

■ Once a prima facie case of discriminatory selection has been shown, "the burden of proof shifts to the State to rebut the presumption of unconstitutional action." *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). Rebuttal evidence may include testimony from government officials concerning the methods of and qualifications for selection. *Castaneda v. Partida,* 430 U.S. at 498, 97 S.Ct. 1272. While testimony from officials denying any discriminatory purpose is appropriate, it will be viewed with *a great deal of judicial scrutiny* in recognition of the defendant's difficulty in contesting the protestations of high government officials. *Castaneda v. Partida,* 430 U.S. at 498 n.19, 97 S.Ct. 1272; *Hernandez v. Texas*; *United States v. McDaniels.*

■ Notwithstanding this heightened scrutiny, the government has presented sufficient evidence to prove the absence of discriminatory intent. Eight Southern District judges who participated in the questioned grand jury empanelments testified in this case. Each denied any racial prejudice or discriminatory purpose in the selection of grand jury forepersons. The judges also testified as to the criteria utilized in making their choices.

One judge could not remember whether the individual chosen as foreperson in his last grand jury empanelment six weeks before his testimony was a man or a woman. Nor could he remember "whether he was of any ethnic background or religious background or anything else." This judge flatly denied any racial motivation, bias, or prejudice with regard to any of the three identified groups:

I would not hesitate to pick a woman, a black, a Hispanic or any—Catholic, Jew, whatever. It simply would make no difference to me if the person seemed responsive to my questioning and reasonably articulate and reasonably intelligent. It would not make any difference to me what their background might be. That is why I can't remember who I have picked I just don't know. . . . I doubt you are going to find any federal judge that has any bias for people because of their religious or racial backgrounds. I just don't think that you can get appointed to the U.S. District Court if you have such a prejudice.

This same judge based his selection of grand jury forepersons on "work history" and on "leadership ability."

Another judge testified that in making his choice for grand jury foreperson, he "considered . . . everybody on the list without regard to color." He made his initial screening for grand jury forepersons on the basis of jury cards submitted to him prior to the open courtroom empanelment. At the time of this initial screening, he "didn't have the slightest idea whether they were black or white." He testified that he based foreperson selection on the criteria of "stability in background" and "length of time in the community."

Another judge's practice is to "always try to pick a different sex for foreman or forewoman, compared to what the one immedi-

ately preceding had been." Although this judge "always wanted somebody I could pick that would be a black foreman or deputy foreman" he "couldn't find one with the management skills that I wanted at that time." His selection criteria included "management experience" and attentiveness during the open courtroom empanelment.

Yet another judge was "totally satisfied in [his] mind" that his selection practices were not racially motivated. According to this judge, "it wouldn't matter a bit" what nationality they were and it would "certainly not" matter what sex they were. His selection criteria included "the ability of presiding," and the ability "to get along well with people."

Chief Judge Clyde Atkins, who was the presiding judge in the majority of empanelments under question, was not conscious of any prejudice in his selection of grand jury forepersons. He was looking for someone who could preside over the deliberations and perform the administrative job necessary without any concern for their race, ethnicity, or other distinguishing characteristic.

The other three judges who testified also denied discriminatory purpose and cited neutral selection criteria.

■ The defense argues that the prima facie case with regard to women cannot be rebutted in light of the conspicuous presence of a large number of women deputy forepersons. Although they served as deputies in twenty-nine of the fifty grand juries in question, women were chosen as foreperson in only five of those grand juries. Because the deputy foreperson is necessarily qualified to serve as foreperson (see, Rule 6(c), Fed.R.Cr.P.), it is argued that the failure to appoint women as forepersons in proportion to their percentages in the general population cannot be explained in any way other than discriminatory purpose. This court disagrees. Appointment to the position of deputy foreperson

does not indicate that the person selected is the *most* qualified, only that that person is qualified as foreperson on that particular grand jury. It is within the judge's discretion to appoint the person he deems *most* qualified to the office of foreperson. See, Rule 6(c), Fed.R.Cr.P. The frequent appointment of females to the deputy foreperson post does not discredit the government's rebuttal evidence showing nondiscriminatory intent.

■ It should also be noted that one of the judges in the district "religiously alternates" between men and women in his selection of successive grand jury forepersons. It is well recognized that purposeful inclusion of distinct classes on grand or petit juries does not constitute discrimination violative of the federal constitution entitling an accused to relief in the federal courts. *Brooks v. Beto,* 366 F.2d 1 (5th Cir. 1966); *accord, James v. United States,* 416 F.2d 467 (5th Cir. 1969); *Castaneda v. Partida,* 430 U.S. at 499 n.20, 97 S.Ct. 1272.

B. Use of voter registration lists as the sole source for names of prospective jurors.

■ The defendants argue that in order to foster the policy and protect the rights secured by sections 1861 and 1862 of the Jury Selection and Service Act, it is necessary to "prescribe some other source or sources of names in addition to voter lists" in accordance with 28 U.S.C. § 1863(b)(2). Because the Plan for the Southern District of Florida [7] concludes that "voter registration lists represent a fair cross section of the community," the district court plan does not include any source other than voter registration lists from which prospective jurors are chosen. The defendant's contention has been made and rejected in other cases challenging the use of voter registration lists in the Southern District of Florida. *United States v. Perry,* 480 F.2d 147 (5th Cir. 1973); *United States v. Gooding,* 473

---

7. "Plan of the United States District Court for the Southern District of Florida for the Random Selection of Grand and Petit Jurors."

F.2d 425 (5th Cir. 1973); *United States v. Blair*, 470 F.2d 331 (5th Cir. 1972); *United States v. Pentado*, 463 F.2d 355 (5th Cir. 1972). *See, United States v. Rodriguez*, 588 F.2d 1003 (5th Cir. 1979). Accordingly, the defendant's challenge to the use of voter registration lists as the sole source of names of prospective jurors is rejected.

## II. *Interjection of Deputy Clerks and Government Prosecutors into the Decision Process for Selection of Grand Jury Forepersons.*

██ The defendants have presented evidence to show that certain judges in the Southern District conferred with government prosecutors and deputy clerks to aid them in the selection of grand jury forepersons and deputies. Testimony showed that just prior to selecting the foreperson of the grand jury which indicted the defendants in this case, the presiding judge received recommendations on the matter from an Assistant United States Attorney. This court finds on the basis of testimony from the judges of the Southern District, that while there is no pattern or practice of receiving recommendations from clerks and government prosecutors, such recommendations are occasionally received and considered by the presiding judge in making his ultimate choice of foreperson. The government does not dispute that clerks and prosecutors occasionally "play[ed] a role in the selection" of grand jury forepersons and deputies, but argues that there is nothing improper about the procedure. This court agrees.

Rule 6(c) of the Federal Rules of Criminal Procedure states that "[t]he court shall appoint one of the jurors to be foreman and another to be deputy foreman." Proof of recommendations is unavailing, provided the ultimate determination is made by the district judge. The defendants have not shown that any district judge of the Southern District of Florida delegated or otherwise avoided his responsibility with regard to the ultimate selection of grand jury forepersons and deputies. Accordingly, the claim of improper interference is rejected.

## III. *Miscellaneous Improprieties.*

### A. *Excusals, Exemptions, Deferrals, Disqualifications.*

██ On the basis of the open court testimony and sworn affidavit of former jury section employee, Michael Lee, and the oral testimony of jury section chief clerk, William Ross Hornsby, this court finds that prospective grand jurors were occasionally excused by jury section clerks without contemporaneous approval by a district court judge. The granting of excusals to prospective jurors who have appeared for orientation in response to jury summonses leaves the effective determination in the hands of the clerks rather than the judge. Because the clerks in the Southern District sometimes made ultimate determinations as opposed to recommendations as contemplated in section 1865 of the Jury Selection and Service Act, this conduct constitutes a violation of the Act.

██ A remedy is not provided, however, for every violation of the Act. The statute provides a remedy only for "substantial" failure to comply with its provisions. *United States v. Smith*, 588 F.2d 111, 115 n.22 (5th Cir. 1979); *United States v. Davis*, 546 F.2d 583, 589 (5th Cir. 1977). Substantial non-compliance is measured by weighing the alleged violations of the Act against the goals of the statute. *United States v. Davis*, at 589. Applying this analysis to the violations shown here, I find that the conduct of the clerks does not constitute a substantial failure to comply with the provisions of the Act. *See, United States v. Evans*, 526 F.2d 701 (5th Cir. 1976). The evidence does not establish that the Southern District clerks applied subjective criteria in excusing or disqualifying prospective jurors. As in *Evans*, "the clerks determined juror qualifications solely on the basis of the criteria specified in the Act and without a discriminatory result." *Id.* at 706. This court concludes that any improprieties in the selection process "did not operate to frustrate the goals of the Act." *Id.* at 706. Accordingly, while this court cannot "expressly approve the measures employed," I do not find a substantial fail-

ure to comply with the Act. *United States v. Smith*, at 115 n.22.

B. *Failure to Require Return of Completed Juror Qualification Forms.*

The provisions of 28 U.S.C. § 1864(a) are discretionary, not mandatory. . . . Any person who fails to return a completed juror qualification form as instructed *may* be summoned by the clerk . . . to fill out a juror qualification form. [Emphasis added.]

Accordingly, any failure to require return of completed juror forms cannot constitute substantial non-compliance with the Act. *See, United States v. Armsbury*, D.C., 408 F.Supp. 1130 at 1142.

C. *Granting of Preferential Treatment to Certain Groups and Individuals.*

To show preferential treatment, the defendants rely primarily upon the sworn statement of former jury section employee, Michael Lee. Chief clerk, William Ross Hornsby, in his oral testimony of August 22, 1979, denied that any preferential treatment was ever extended. Having weighed the evidence and having carefully considered the credibility of both witnesses, I find that no individual was excused, exempted, deferred, or disqualified for any unlawful or improper purpose.

D. *Practice of Non-Random Selection of Grand Jurors by the "Palming" of Juror Cards During Empanelments.*

In support of this allegation, the defendants again rely on the sworn affidavits and testimony of Michael Lee. Lee testified that on one occasion he had observed section chief Ross Hornsby "palming" a grand juror's tag during an open court empanelment proceeding. Lee testified that he observed Hornsby place a preselected grand juror's tag card in his palm, and pretend to pull it from the grand jury tag box as if it were being drawn at random. Lee also testified that other jury section clerks knew of this incident and were told to engage in like conduct on other occasions. Despite this claim, however,

Lee's testimony is not corroborated by any other section clerk. Although two of Lee's colleagues had heard of "palming," neither had ever observed it performed. William Ross Hornsby, in testimony before this court, denied the accusation. Hornsby noted that in each of the empanelments in which he participated, a United States Marshal was seated just to his right. Hornsby is blind in his right eye, and asserts that it would not have been feasible to attempt such a scheme in any event. Hornsby also testified that such an act could not have been successfully performed in light of the presence of a United States Marshal, a court clerk, a trial judge, and a courtroom of jurors intensely watching the selection process.

This court finds that there is insufficient competent evidence in the record to support the allegation of palming. This finding of fact has been made after carefully reviewing the testimony and affidavits of Michael Lee and after having had an opportunity to judge the credibility of the witnesses and the reliability of their testimony.

For the above reasons, the defendants' motion to dismiss the indictment is denied.